UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RATTIYA UNTHAKSINKUN, et al.,

        Plaintiffs,

        v.

DOUGLAS PORTER,

        Defendant.

CASE NO. C11-0588JLR

ORDER ON MOTION FOR
CLASS CERTIFICATION AND
MOTION FOR PRELIMINARY
INJUNCTION

This matter comes before the court on Plaintiffs Rattiya Unthaksinkun, Susan

Ahmadi, Khaddouj Atif, S.J.,[1] and Anna Sergeyevna Ponomareva's Second Amended

Motion for Class Certification (Dkt. # 31) and Second Amended Motion for a

Preliminary Injunction (Dkt. # 32). Plaintiffs bring their Second Amended Complaint

pursuant to 42 U.S.C. § 1983 and allege Fourteenth Amendment due process and equal

protection claims against Defendant Douglas Porter ("Defendant"), in his official

---

    [1] Ms. S.J. seeks to participate in this case using only her initials because she is in the
Washington Address Confidentiality Program. (S.J. Decl. (Dkt. # 34) ¶ 2.)

capacity as the Administrator of the Washington State Health Care Authority ("HCA").

(*See generally* 2d Am. Compl. (Dkt. # 30).) Plaintiffs' due process claim arises from the method in which the HCA notified Plaintiffs that their Washington State Basic Health ("Basic Health") subsidized health insurance benefits would be terminated. Plaintiffs' equal protection claim stems from the HCA's decision to disenroll them from Basic Health because of their immigration status.

Plaintiffs move the court to certify the following two classes:

(1) All Washington state residents who were sent notices by HCA informing them that their Basic Health benefits would be terminated effective March 1, 2011 because of their immigration status and have not subsequently had their Basic Health benefits unconditionally reinstated (the "Due Process class").

(2) All Washington residents who are immigrants lawfully present in the United States (a) whose Basic Health benefits terminated effective March 1, 2011 because of their immigration status and have not subsequently had their benefits reinstated, or (b) in the future would be eligible for Basic Health benefits, but for their citizenship or immigration status (the "Equal Protection class").

(2d Am. Mot. for Class Cert. (Dkt. # 31) ("Cert. Mot.") at 2.) Plaintiffs also ask the court to enter a preliminary injunction requiring the HCA to reinstate all class members' benefits while this matter is litigated, to continue enrollment for all Equal Protection class members who are otherwise eligible, to restore coverage for eligible medical care received since March 1, 2011, and to prevent the HCA from terminating Due Process class members' benefits again without constitutionally adequate notice. (2d Am. Mot. for Prelim. Inj. (Dkt. # 32) ("Inj. Mot.") at 2.) Having considered the briefing of the parties, the record, and the relevant law, and having heard oral argument, the court GRANTS IN

PART and DENIES IN PART Plaintiffs' Second Amended Motion for Class

Certification (Dkt. # 31), and GRANTS IN PART and DENIES IN PART Plaintiffs'

Second Amended Motion for a Preliminary Injunction (Dkt. # 32). The court ORDERS

preliminary injunctive relief as set forth in this Order.

# I.     BACKGROUND

**A. History of Washington State Basic Health Program**

Since 1987, the Washington State Basic Health program has subsidized private

health insurance premiums for eligible Washington residents.[2] (Cody Decl. (Dkt. # 39) ¶

5.) The program is governed by the Health Care Access Act of 1987, Chapter 70.47

RCW ("the HCAA"), and is currently administered by the HCA. The purpose of the

HCAA is "to provide or make more readily available necessary basic health care services

in an appropriate setting to working persons and others who lack coverage, at a cost to

these persons that does not create barriers to the utilization of necessary health care

services." RCW 70.47.010(3). The program was funded entirely by the State of

Washington ("the State") until 2011, at which time the State began to receive some

federal funding for the program. (*See* Cody Decl. ¶ 13.)

The HCA administrator is tasked with subsidizing insurance premiums to the

maximum extent possible while not exceeding funding limits. *See* RCW 70.47.010(5)(c).

---

[2] Basic Health also provides unsubsidized health insurance. This case, however, involves
only the subsidized portion of the program.

When enrollment is closed, the administrator maintains a waiting list.[3]  RCW 70.47.060(6); *see also* Cody Decl. ¶¶ 6-8.  In 2009, the State Legislature amended the HCAA to allow the administrator to disenroll Basic Health members to prevent overexpenditure.  RCW 70.47.060(6); Cody Decl. ¶ 9.  Before this time, the administrator could only disenroll members for good cause.  *See* WAC 182-24-070(2).

Regardless of the reason for disenrollment, the administrator must mail written notice of disenrollment at least ten days before the effective date of disenrollment.  WAC 182-24-070(4).  This notice must state the reason for the disenrollment and the effective date of disenrollment, describe the procedures for disenrollment, and inform the enrollee of his or her right to appeal the disenrollment decision under WAC 182-22-320.  WAC 182-24-070(4).  A party that chooses to appeal disenrollment may request an in-person or telephonic hearing, but if no request is made, the HCA will decide the appeal based on the information and documentation submitted.  WAC 182-22-320(4).  Furthermore, a member who appeals a disenrollment decision based on eligibility issues may remain enrolled during the appeal process provided that the member submitted the appeal according to the rules, remains otherwise eligible, continues to make all premium payments when due, and has not demonstrated a danger or threat to any person affiliated with the HCA.  WAC 182-22-320(8).

---

[3] As of March 2010, the waiting list included more than 100,000 individuals, and it has continued to grow.  (Cody Decl. ¶ 10.)

**B. Federal Funding for Basic Health**

The Social Security Act allows the Secretary of the United States Department of Health and Human Services ("the DHHS") to fund state projects, known as demonstration waivers, which are designed to promote the objectives of the Medicaid statute. 42 U.S.C. § 1315. In June 2010, the Washington State Medicaid Purchasing Administration applied for a demonstration waiver ("the Bridge Waiver"), which it hoped would cover two-thirds of the cost of the State's Basic Health program until 2014, when national health care reform is fully implemented. (Cody Decl. ¶¶ 10-11.) In a July 7, 2010 letter from Defendant to the federal Centers for Medicare and Medicaid Services ("CMS"), Defendant wrote: "As we have discussed, the future of [Basic Health] is in jeopardy without the waiver. With the waiver, Washington State has increased fiscal flexibility to extend a critical coverage bridge to some 90,000 individuals, with about 69,000 financed through the waiver."[4] (Varon Decl. (Dkt. # 9) Ex. D.) The Bridge Waiver was approved on January 3, 2011, and as a result, the State could rely on federal funding to help cover the costs of the program.[5] (Cody Decl. ¶¶ 13, 21.)

_____

[4] Basic Health was at risk of being eliminated. Governor Gregoire's proposed 2011-2013 biennium budget would have eliminated Basic Health as of July 1, 2011, and the Governor's December 2010 proposed supplemental operating budget would have eliminated Basic Health as of March 1, 2011. (Cody Decl. ¶ 12.)

[5] CMS's Special Terms and Conditions for the Bridge Waiver noted that "Washington will sustain coverage for approximately 30,000 individuals that will remain in the State-only programs as they would not currently meet the [Bridge Waiver] eligibility criteria." (Varon Decl. Ex. C. (Bridge Waiver STC) § II.) On January 27, 2011, the Secretary of Washington's Department of Social and Health Services sent a letter to CMS clarifying that although the State hoped to sustain Basic Health coverage for individuals who did not meet the Bridge Waiver

Under the terms of the Bridge Waiver, CMS provides federal matching funds for current Basic Health members who are "Transition Eligible." (Varon Decl. Ex. C. (Bridge Waiver Special Terms & Conditions ("Bridge Waiver STC")) § IV(16).) An individual is Transition Eligible if he or she (1) resides in the State; (2) is between 19-64 years of age; (3) meets the federal income requirements; (4) is ineligible for Medicaid or the Children's Health Insurance Program; and (5) is a United States citizen or "qualified non-citizen." (*Id.* § IV(17)(a)(i).) There are two general requirements for an individual to be a "qualified non-citizen" under the Bridge Waiver.[6] First, the individual must be a "qualified alien" as defined in section 1641 of the Professional Responsibility and Work Opportunity Act of 1996 (the "PRWORA"), 8 U.S.C. § 1601, *et seq.*. 8 U.S.C. §§ 1641(b)-(c). Qualified aliens include, among others, lawfully admitted permanent residents, aliens who have been granted asylum, and refugees. *Id.* Second, the individual must have been a qualified alien for at least five years (the "five-year bar"), or the individual must qualify for one the exceptions to the five-year bar. 8 U.S.C. § 1613. Among others, there is an exception for certain veterans and their spouses. 8 U.S.C. § 1613(b)(2).

---

eligibility criteria, the State did not consider this sustained coverage a requirement under the Bridge Waiver. (Hamilton Decl. (Dkt. # 40) Ex. 3 at 3-4.)

[6] All Medicaid requirements not expressly waived or identified as not applicable in the Bridge Waiver STC applied to the Bridge Waiver. (Hamilton Decl. Ex. 2 (Bridge Waiver STC) § III(2).) The Bridge Waiver did not expressly waive or identify as not applicable the benefit eligibility requirements set forth in the Professional Responsibility and Work Opportunity Act of 1996, 8 U.S.C. § 1601, *et seq.*. Accordingly, these provisions apply to the Bridge Waiver.

## C. Changes to Basic Health Eligibility Requirements

On February 4, 2011, the State Senate adopted a 2011 budget that would have required the HCA to disenroll all adult Basic Health members who did not provide the HCA with a valid Social Security number or other proof of legal residence in the United States. (Longhorn Decl. (Dkt. # 41) ¶ 6.) The HCA's staff believed that it was likely that the State Legislature would adopt the Senate's 2011 budget; therefore, on February 8, 2011, the HCA sent a letter requesting that all Basic Heath members for whom the agency did not have a valid Social Security number submit their Social Security numbers no later than February 17, 2011.[7] (*Id.* ¶¶ 3-4.) The HCA also drafted, finalized, and printed a disenrollment notice to send to these members after the State passed a final budget (the "Disenrollment Notice"). (*Id.* ¶ 10.)

On February 18, 2011, the State Legislature passed the fiscal year 2011 supplemental budget ("ESHB 1086"), which reduced Basic Health funding by approximately $9.8 million. ESHB 1086, 62d Leg., Reg. Sess. (Wash. 2011) (codified as Chapter 5, Laws of 2011); Cody Decl. ¶ 14. Governor Gregoire signed ESHB 1086 into law the same day. (Cody Decl. ¶ 14.) The bill restricted Basic Health eligibility more severely than the State Senate's budget. (Longhorn Decl. ¶ 6.) ESHB 1086 directed the HCA administrator, "[a]s soon as practicable after February 28, 2011," to limit

---

[7] Basic Health had never before conditioned eligibility on proof of legal residence or requested this information from its members. *See* WAC 182-24-020(1) (2010) (setting forth Basic Health eligibility requirements in 2010).

1 | enrollment to those who qualify for subsidized Basic Health benefits and are either

2 | Transition Eligible or licensed foster parents.  ESHB 1086 § 213(8).

3 |    Prior to ESHB 1086, a State resident qualified for subsidized Basic Health

4 | benefits if that individual: (1) was not eligible for free or purchased Medicare; (2) was

5 | not receiving medical assistance from the Washington State Department of Social and

6 | Health Services; (3) was not enrolled in the Washington Health Program (an

7 | unsubsidized state-administered health insurance program); (4) was not confined or

8 | residing in a government-operated institution, unless that person met eligibility

9 | requirements adopted by the HCA administrator; (5) was not a full-time student in the

10 | United States on a temporary student visa; (6) resided in an area of the state served by a

11 | managed health care system participating in the plan; (7) chose to obtain coverage from a

12 | particular managed health care system; (8) paid his or her portion of the costs for

13 | participation in the plan; and (9) had a gross family income at the time of enrollment that

14 | met the program's requirements.[8]  WAC 182-24-020(1) (2010).  After ESHB 1086, a

15 | resident had to be Transition Eligible in addition to meeting these requirements.  In

16 | limiting Basic Health eligibility to those who were Transition Eligible, ESHB 1086

17 | required the HCA administrator to disenroll Basic Health members who did not meet the

18 |

19 | _____

20 |   [8] On April 29, 2011, Governor Gregoire signed into law House Bill 1544, which
amended the definition of a "subsidized enrollee" in the HCAA, RCW 70.47.020(9), to require
21 | otherwise eligible members and applicants to also be Transition Eligible.  HB 1544, 62d Leg.,
Reg. Sess. (Wash. 2011) (codified as Chapter 205, Laws of 2011).  The HCA filed amended
22 | regulations to reflect this change on July 8, 2011, which went into effect on August 8, 2011.  *See*
WAC 182-24-020(1) (2011).

Bridge Waiver's more restrictive eligibility requirements for citizenship, age, and income.

**D. Disenrollment of Basic Health Enrollees**

The same day ESHB 1086 went into effect, the HCA administrator determined that he would have to disenroll non-Transition Eligible Basic Health members effective March 1, 2011 to avoid overexpenditure. (Cody Decl. ¶ 15.) To comply with the ten-day notice requirement set forth in WAC 182-24-070(2), the HCA had to mail disenrollment letters immediately. (Cody Decl. ¶ 15.) On February 18, 2011, the same day ESHB 1086 went into effect, the HCA mailed disenrollment notices to approximately 17,000 Basic Health members. (Longhorn Decl. ¶ 7; Vaughn Decl. (Dkt. # 42) ¶¶ 7-8.) The HCA used three different disenrollment notices to address the three reasons for disenrollment—age, income, and citizenship. The HCA sent the age-based disenrollment notice to approximately 700 individuals over age 64 and the income-based notice to approximately 875 persons whose income was too high. (Longhorn Decl. ¶ 10; Vaughn Decl. ¶ 8.)

The HCA also sent the Disenrollment Notice to approximately 15,350 individuals for whom it did not have a Social Security number or proof of citizenship or immigration status. (Longhorn Decl. ¶ 10; Vaughn Decl. ¶ 7.) Although the HCA drafted the Disenrollment Notice based on the State Senate's 2011 budget, it did not revise the Disenrollment Notice to reflect the differences in ESHB 1086. The Disenrollment Notice stated in relevant part:

1     Dear Subscriber:

2     The member(s) listed below will lose Basic Health (BH) coverage effective
   12:01 a.m. on March 1, 2011.  BH is unable to verify the member(s) legally
3     resides in the United States.

4     <MEMBERS>

5     Basic Health requires individuals between ages 19-64 to legally reside in
   the United States to receive BH coverage.[]
6

7     If you have already paid your premium, we will refund your payment.

8     If you believe the action taken on your account is wrong, we must receive
   your appeal within 30 days of the date of this letter (See Appeal Rights).
   Include with your appeal a valid Social Security number (SSN) and date of
9     birth or current immigration documentation proving the above listed
   member(s) legally resides in the United States.
10

                             * * * * *

11    Appeal Rights
   If you believe the action taken on your account is wrong, we must receive
12    your appeal within 30 days of the date of this letter.  Send a written appeal
   to PO Box 42690, Olympia, WA 98504 with your name, BH ID number,
13    mailing address, and daytime phone number.  In your appeal, you must
   explain the decision you disagree with, why you disagree, what you want to
14    change, and include any documents you have to support your request.

15    For more information, visit http://basichealth.hca.wa.gov or call 1-800-660-
   9840.
16

17 (2d Varon Decl. Ex. C at 3-4.)  Although the Disenrollment Notice explained some of the

recipients' appeal rights, it did not cite the governing regulations or notify the individual
18

that he or she could request continued coverage pending the outcome of an appeal under
19

those regulations.  *See* WAC 182-22-320.  Indeed, the only citation in the Disenrollment
20

Notice was to Chapter 568, Laws of 2009.  Section 3 of Chapter 568 authorized the HCA
21

22

administrator to disenroll persons from Basic Health; it did not explain the new eligibility requirements or cite to the applicable sections of the PRWORA, 8 U.S.C. §§ 1641, 1613.

As of April 11, 2011, the HCA had received appeals from and had reinstated over 4,000 members. (Cody Decl. ¶ 17.) As of May 2, 2011, the HCA had denied 1,280 appeals from individuals who had received the Disenrollment Notice. (Vaughn Decl. ¶ 7.) Of this group, 828 were denied reinstatement due to the five-year bar. (*Id.*)

**E. The Plaintiffs**

Each named Plaintiff is a lawful permanent resident who was disenrolled from Basic Health effective March 1, 2011 because Basic Health lacked information concerning her immigration status. (*See generally* 2d Am. Compl.) Each named Plaintiff appealed her disenrollment by sending the HCA proof of lawful residence. (*Id.*) The HCA denied each appeal because "[t]he information [the Plaintiff] provided shows [she] entered the U.S. after August 22, 1996 and has not met the five year wait period required under federal law." (*Id.*) On May 13, 2011, the HCA reinstated Basic Health benefits for Ms. Unthaksinkun, Ms. Ahmadi, and Ms. Atif pending the outcome of their administrative appeals.[9] (Inj. Mot. at 20 n.21.) On May 24, 2011, the HCA reenrolled Ms. Ponomareva because she qualifies for the exception to the five-year bar for

---

[9] The court has no information regarding the outcome, if any, of these appeals.

individuals who are spouses of veterans.[10]  (McKinzie Decl. (Dkt. # 43) ¶¶ 5-8.)  Ms. S.J. has not been reenrolled.

Each named Plaintiff relied on her Basic Health benefits and has been adversely affected by disenrollment.  (*See generally* 2d Am. Compl.)  Ms. Unthaksinkun was diagnosed with breast cancer in 2010 and had two surgeries that year.  (Unthaksinkun Decl. (Dkt. # 7) ¶ 6.)  After being disenrolled from Basic Health, she cancelled a follow-up doctor's appointment because she could not afford it without health insurance.  (*Id.*)  Ms. Ahmadi used her Basic Health for preventative care and the occasional illness or injury.  (Ahmadi Decl. (Dkt. # 21) ¶ 13.)  Ms. S.J. has a cyst in her breast that requires an annual mammogram, which she cannot afford without health insurance.  (S.J. Decl. (Dkt. # 34) ¶ 16.)  Ms. Atif has a thyroid condition that requires medication and monitoring; she also has knee pain and swelling.  (Atif Decl. (Dkt. # 20) ¶ 13.)  Without Basic Health, she has been unable to afford her medication or her health care provider's recommended treatment.  (*Id.* ¶ 14.)  Ms. Ponomareva has a thyroid condition that requires medication and monitoring by her physician, as well as another disorder for which she may need surgery.  (Ponomareva Decl. (Dkt. # 35) ¶ 16.)  After she was disenrolled from Basic Health, she had to cancel an appointment with her physician regarding her thyroid condition, as well as an annual examination.  (*Id.*)  She has also been unable to see a specialist regarding her possible surgery.  (*Id.*)

---

[10] Ms. Ponomareva was only reinstated after multiple appeals and with the help of an attorney.  (McKinzie Decl. (Dkt. # 43) ¶¶ 4-6; Ortego Decl. (Dkt. # 33) ¶¶ 9-12.)

## F. The Instant Lawsuit

On April 7, 2011, Plaintiffs filed the instant lawsuit. (Compl. (Dkt. #1).) In their second amended complaint, filed on May 23, 2011, they allege that Defendant, in his capacity as the HCA administrator, violated their due process and equal protection rights under the Fourteenth Amendment of the United States Constitution. (*See generally* 2d Am. Compl.) Plaintiffs challenge their disenrollment and the disenrollment of Due Process class members because, allegedly, they were not given adequate, meaningful, and timely notice of the termination of their benefits as required by due process (the "due process claim"). (*Id.* ¶¶ 98-102.) Plaintiffs further claim that Defendant violated the equal protection clause when he disenrolled them and other Equal Protection class members while continuing to provide Basic Health benefits to similarly situated United States citizens and qualified non-citizens (the "equal protection claim"). (*Id.* ¶¶ 89-97.)

Also on May 23, 2011, Plaintiffs filed their second amended motions for class certification and a preliminary injunction (Dkt. ## 31, 32). Plaintiffs seek class certification at this early stage in the litigation so that any preliminary injunctive relief will benefit all class members. (Cert. Mot. at 2.) The court heard oral argument on August 12, 2011, and this order follows.

## II.    ANALYSIS

## A. Motion for Class Certification (Dkt. # 31)

Plaintiffs seek to certify two classes—the Due Process class and the Equal Protection class—under Federal Rule of Civil Procedure 23(b)(2). Plaintiffs also request that the court appoint them as class representatives and their counsel as class counsel.

Defendant disputes justiciability and contests most Rule 23(a) factors, as well as whether Rule 23(b)(2)'s requirements have been met.

As discussed below, the court grants in part and denies in part Plaintiffs' motion (Dkt. # 31). The court certifies the Due Process class as defined by Plaintiffs, with some minor revisions. *See infra*, § II(A)(6). The court certifies an equal protection class that includes individuals who were disenrolled from Basic Health but does not include future class members. *Id.* The court appoints Ms. Unthaksinkun, Ms. Ahmadi, Ms. Atif, and Ms. S.J. as class representatives, but does not appoint Ms. Ponomareva. The court also appoints Plaintiffs' counsel as class counsel.

### 1. Standards for Evaluating Motions for Class Certification

Federal Rule of Civil Procedure 23 sets forth the prerequisites for maintaining a class action. Before certifying a class, the court must be satisfied, after a "rigorous analysis," that the prerequisites of Rule 23(a) are met and that the class fits within one of the three categories of Rule 23(b). *Wal-Mart Stores, Inc. v. Dukes*, --- U.S. ---, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). This requirement is more than "a mere pleading standard." *Id.* "A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.* Indeed, "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question" because "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* (quoting *Falcon*,

457 U.S. at 160). Any inquiry into the merits, however, should be limited to determining whether the requirements of Rule 23 are met and "may not go so far . . . as to judge the validity of the[] claims." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003)); *see also Aho v. AmeriCredit Fin. Servs., Inc.*, --- F.R.D. ---, 2011 WL 3047677, * 3 (S.D. Cal. July 25, 2011). If a court is not fully satisfied that the requirements of Rules 23(a) and (b) have been met, certification should be refused. *Falcon*, 457 U.S. at 161. Even if the Rule 23 criteria are met, the court is given discretion over whether to certify a class. *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1090 (9th Cir. 2010).

## 2. Justiciability of Plaintiffs' Due Process Claim

As a preliminary matter, the court must address Defendant's argument that Plaintiffs lack standing to bring the due process claim. (Resp. to Cert. Mot. at 13-14.) If Plaintiffs do not have standing, they cannot represent the proposed Due Process class. *See Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003). To satisfy the minimum constitutional requirements for standing under the Case or Controversy requirement of Article III:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Thus, while general factual allegations may suffice at the pleading stage, on summary judgment the plaintiff must present specific facts supporting each element of the standing inquiry. *Id.* At the class certification stage, the plaintiff's burden is something more than a mere pleading standard, which may require the court to probe beyond the pleadings. *Dukes*, 131 S. Ct. at 2551. Thus, the court applies the standard applicable to class certification motions to the question of standing here, and as discussed below, concludes that Plaintiffs have demonstrated each element of standing.

It is undisputed that Plaintiffs each received the Disenrollment Notice and were terminated from Basic Health on March 1, 2011. (2d Am. Compl. ¶¶ 4-8; Unthaksinkun Decl. ¶ 9; Ahmadi Decl. ¶ 8; Atif Decl. ¶ 8; Ponomareva Decl. ¶ 5; S.J. Decl. ¶10.) Plaintiffs contend that their resulting injuries are two-fold: first, "that the [HCA] failed to give Plaintiffs a meaningful, individualized explanation of the reason for and information justifying termination of their benefits that could enable them to decide whether to appeal the termination and prepare an adequate appeal"; and second, "that the notice failed to provide notice of Plaintiffs' right to request and receive continued benefits pending appeal." (Reply to Cert. Mot. at 3.) As discussed *infra*, section II(B)(2)(a), Plaintiffs have established a likelihood that Defendant terminated their benefits without due

1  process.  This is more than sufficient to satisfy the court that Plaintiffs have satisfied the

2  injury in fact element of Article III standing.  Plaintiffs' alleged injuries are fairly

3  traceable to Defendant, and are likely to be redressed by an order reinstating their

4  benefits pending constitutionally sufficient notice.

5  　　　Defendant argues, however, that Plaintiffs appealed the Disenrollment Notice "and

6  thus cannot claim [it] was insufficient or misleading."  (Resp. to Cert. Mot. at 13.)  The

7  fact that Plaintiffs appealed, however, does not establish that the Disenrollment Notice

8  complied with due process.  *See Elkins v. Dreyfus*, No. C10-1366 MJP, 2011 WL

9  3438666, at *5 (W.D. Wash. Aug. 5, 2011) (finding that plaintiff who appealed the

10 termination of his welfare benefits had standing to challenge whether the termination

11 notice complied with due process); *Rodriguez v. Chen*, 985 F. Supp. 1189, 1192, 1194-96

12 (D. Ariz. 1996) (holding that termination notice was constitutionally insufficient in a case

13 where some plaintiffs had appealed and others had not).  As discussed below, due process

14 requires notice that sufficiently details the reason for the action so that the affected party

15 may determine the accuracy of the action and meaningfully appeal.  *See infra* §

16 II(B)(2)(a).  Courts do not decide this question based on whether the affected party

17 appealed.  *See, e.g.*, *Elkins*, 2011 WL 3438666, at *5; *Rodriguez*, 985 F. Supp. at 1192,

18 1194-96.

19 　　　**3.  Justiciability of Class Members' Claims**

20 　　　Before proceeding to the merits, the court also addresses the justiciability of the

21 claims of the proposed class members.  As discussed *supra*, section II(A)(2), Plaintiffs

22 must affirmatively demonstrate, as to the class members: (1) an injury in fact; (2)

causation; and (3) redressability.  *Lujan*, 504 U.S. at 560-61; *Friends of the Earth*, 528 U.S. at 180-81.  For the Due Process class, Plaintiffs contend that all class members were injured when their benefits were terminated with constitutionally insufficient notice that did not provide them with enough information to meaningful appeal or inform them that they could request continuing benefits pending appeal.  (Reply to Cert. Mot. at 3.)  Because Plaintiffs have established a likelihood that Defendant did not comply with due process, *see infra*, § II(B)(2)(a), Plaintiffs have affirmatively demonstrated the "injury in fact" element.  As with Plaintiffs, the alleged injury of class members is fairly traceable to Defendant's conduct and redressable by the court.

The Equal Protection class involves two distinct groups: (1) lawful immigrants whose Basic Health benefits were terminated March 1, 2011 because of their immigration status and have not had their benefits reinstated; and (2) lawful immigrants who would be eligible for Basic Health benefits in the future, but for their citizenship or immigration status.  (Cert. Mot. at 2.)  The first group has standing, the second group does not.

As to the group that was disenrolled, they suffered a concrete, actual injury when their Basic Health benefits were terminated.  *See, e.g.*, *Indep. Living Ctr. of S. Cali. v. Maxwell-Jolly*, 572 F.3d 644, 658-59 (9th Cir. 2009), *cert granted*, 131 S. Ct. 992 (2011) (finding that plaintiffs were injured by a reduction in their health care benefits).  This injury is fairly traceable to Defendant's decision to disenroll them and redressable by the court.  All three elements of standing are satisfied.

Plaintiffs, however, have not sufficiently demonstrated an injury in fact as to individuals who would be eligible for Basic Health in the future, but for their citizenship

or immigration status. This portion of the proposed equal protection class is not restricted to individuals who will apply for and will be denied benefits; it includes those who will never apply for Basic Health benefits, regardless of the citizenship eligibility requirements. As such, they have not suffered an "actual or imminent" injury.[11] *See Lujan*, 504 U.S. at 560, 564 (holding that plaintiffs, who challenged the government's policy to protect endangered species within the United States but not abroad, had not suffered an actual or imminent injury where they did not have concrete plans to travel abroad to observe endangered wildlife). Because the Equal Protection class, as defined by Plaintiffs, includes this discrete group of individuals who lack standing, the court exercises its discretion to redefine the "Equal Protection class" to mean "all Washington residents who are immigrants lawfully present in the United States whose Basic Health benefits terminated effective March 1, 2011 because of their immigration status and have not subsequently had their benefits reinstated."

Defendant nevertheless contends that both classes include individuals who lack standing. He asserts that (1) individuals who received the Disenrollment Notice but failed to respond lack standing to assert either due process or equal protection claims; (2) members of the Due Process class who received the Disenrollment Notice but failed to appeal do not have ripe claims; and (3) individuals who are not lawful residents lack

---

[11] The court notes further that even if such individuals had standing, the court would not certify an equal protection class that includes them. Federal Rule of Civil Procedure 23(b)(2) requires that a single injunction provide relief to each class member. *Dukes*, 131 S. Ct. at 2557. The injunctive relief that Plaintiffs seek—reinstatement of class members' benefits—could not apply to these individuals as they have never been enrolled in Basic Health.

standing to be in the Due Process class. (Resp. to Cert. Mot. at 4-10.) As discussed

below, the court rejects each argument.

### a. Standing of Individuals who Failed to Respond to the Disenrollment Notice

Defendant asserts three reasons why individuals who did not appeal their

disenrollment lack standing: (1) Plaintiffs cannot establish that individuals who received

the Disenrollment Notice but failed to respond suffered an injury in fact because the HCA

has no way to know whether these individuals are Transition Eligible; (2) Plaintiffs

cannot establish causation because there is no evidence that the content of the

Disenrollment Notice prevented any individual from appealing; and (3) the Supreme

Court's decision in *Mathews v. Diaz*, 426 U.S. 67 (1976), dictates that the classes cannot

include individuals who have not had their eligibility administratively determined. (*See*

Resp. to Cert. Mot. at 5-6.) Defendant's arguments miss the mark.

Defendant's first argument misconstrues the alleged injuries. Contrary to

Defendant's assertions, Plaintiffs do not claim that class members were injured because

the HCA incorrectly determined their eligibility under the Bridge Waiver. For the Due

Process class, the claimed injury is the deprivation of a property interest without

constitutionally adequate process, and for the Equal Protection class, the claimed injury is

disenrollment from Basic Health benefits because of unconstitutional eligibility

requirements. (Reply to Cert. Mot. at 3-4.) Neither of these harms depends on whether a

class member appealed his or her disenrollment.

1    Defendant's second argument, regarding causation, similarly confuses the issues.

2   Class members allegedly were injured when they were deprived of a property interest

3   without a constitutionally sufficient notice (i.e., the Disenrollment Notice). They need

4   not have appealed to have suffered this injury. *See Elkins*, 2011 WL 3438666, at *5;

5   *Rodriguez*, 985 F. Supp. at 1192, 1194-96. As noted above, a termination notice must

6   contain sufficient information to allow the affected party to assess the accuracy of the

7   determination and prepare a meaningful response. *See, e.g.*, *Rodriguez*, 985 F. Supp. at

8   1194-96. The fact that some recipients of the Disenrollment Notice appealed does not

9   resolve this issue. Further, Plaintiffs have provided evidence that the explanation of the

10  appeal process in the Disenrollment Notice was confusing to at least some recipients.

11  (*See generally* Pico Decl. (Dkt. # 51).) The court also concludes, similarly to named

12  Plaintiffs, that if class members were deprived of a property interest without due process,

13  as Plaintiffs allege, then the resultant injuries would be fairly traceable to the process

14  Defendant provided. This satisfies the causation element of standing.

15    Finally, Defendant's reliance in *Diaz* is inapposite. In *Diaz*, the Supreme Court

16  found that the court lacked jurisdiction over class members who "will be denied"

17  enrollment in a supplemental medical insurance program under Medicare because they

18  had not had their benefits claims administratively adjudicated as required by 42 U.S.C. §

19  405(g). *Diaz*, 426 U.S. at 71 n.3. Because this action does not involve Medicare, section

20  405(g) has no bearing on the instant dispute. Further, Defendant does not argue that the

21  Washington State Administrative Procedures Act (the "APA"), RCW 34.05, *et seq.*,

22  prevents this court from adjudicating the claims of individuals who did not appeal their

disenrollment.  Although the APA generally requires exhaustion of administrative

remedies, it permits the court to "relieve a petitioner of the requirement to exhaust any or

all administrative remedies upon a showing that: (a) The remedies would be patently

inadequate; [or] (b) The exhaustion of remedies would be futile . . . ."  RCW

34.05.534(3).   Here, Plaintiffs have alleged that the notice they received was inadequate

to prepare a meaningful response.  Accordingly, the court concludes that the exceptions

to administrative exhaustion set forth in RCW 34.05.534(3) would be applicable here.

*See Orion Corp. v. State of Washington*, 693 P.2d 1369, 1378-79 (Wash. 1985) (excusing

administrative exhaustion where application for land use permits would have been futile

because the state had designated plaintiff's land as a wildlife sanctuary and would not

have granted the permits).

### b.  Ripeness of Due Process Class Members' Claims

"For a suit to be ripe within the meaning of Article III, it must present concrete

legal issues, presented in actual cases, not abstractions."  *Colwell v. Dep't of Health &*

*Human Servs.*, 558 F.3d 1112, 1123 (9th Cir. 2009) (internal quotation and citation

omitted).  As the Ninth Circuit has observed, "the constitutional component of the

ripeness inquiry . . . , in many cases, . . . coincides squarely with standing's injury in fact

prong."  *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 773 (9th Cir. 2006)

(quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir.

2000) (en banc)) (alterations in *Sacks*).  Defendant contends that Due Process class

members who failed to appeal the Disenrollment Notice do not have ripe claims because

the HCA has been unable to determine whether they are Transition Eligible.  (Resp. to

ORDER- 22

Cert. Mot. at 6.)  This is essentially the same argument Defendant made in contesting the injury-in-fact prong of the standing analysis.  (*See id.* at 5.)  As the court previously explained, *see supra* § II(A)(3)(a), Defendant's argument misconstrues the nature of the due process claim, which ripened when Due Process class members were terminated from Basic Health, allegedly without due process.

### c. Standing of Due Process Class Members who are Not Lawful Residents

Defendant contends that the proposed Due Process class includes individuals who are not lawful residents and therefore do not have a protected property interest that would trigger the protection of the due process clause.  (Resp. to Cert. Mot. at 7.)  In particular, Defendant argues that unlawful immigrants do not have a protected property interest because they can never be eligible for benefits under the Bridge Waiver.  (*Id.*)  The court disagrees.

As explained in more detail *infra*, section II(B)(2)(a), property interests are created by state laws that contain mandatory language regarding eligibility for and termination of benefits.  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 578 (1972); *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir. 1998).  Before the State Legislature adopted ESHB 1086, the HCAA and the Basic Health regulations contained such mandatory language that did not exclude unlawful residents from eligibility.  *See, e.g.*, RCW 70.47.020(a); WAC 182-24-020(1) (setting forth eligibility requirements); *see also infra*, § II(B)(2)(a)(i) (providing additional examples of mandatory language in the Basic Health regulations).  Therefore, it is likely that all Due Process class members obtained a

property interest in Basic Health benefits regardless of whether they were lawful residents.[12]

Defendant's argument "confuses the right to receive a benefit with the right to fair decision-making before the benefit is denied." *Mallette v. Arlington Cnty. Emps.' Supplemental Ret. Sys. II*, 91 F.3d 630, 637 (4th Cir. 1996). In *Mallette*, a former county employee claimed that the county denied her application for disability benefits without due process. *Id.* at 632. The court concluded that the county ordinance created a property interest in disability benefits because it contained mandatory language regarding eligibility. *Id.* at 636. The county argued that the plaintiff did not have a property interest because it had determined that she did not meet the eligibility requirements contained in the ordinance. *Id.* The court rejected this argument because, under the county's approach, "any adverse decision on the merits would insulate it from the obligation to provide due process." *Id.* In this case, Defendant's argument mirrors the county's argument in *Mallette*, and like the court in *Mallette*, this court concludes that the argument is incorrect.

### 4. Rule 23(a) Requirements

The court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class;

---

[12] Defendant also asserts that unlawful immigrants have "no injury-in-fact attributable to the alleged inadequate notice that is redressable by the Court." (Resp. to Cert. Mot. at 7.) Given that all Due Process class members likely have a property interest in Basic Health benefits, the court concludes that deprivation of this interest without due process of law causes an injury that would be redressable by a court order requiring constitutionally sufficient process.

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *see also Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010).

### a. Numerosity

Rule 23(a)(1) requires the court to find that the class is so numerous that joinder of all of its members is impracticable. Fed. R. Civ. P. 23(a)(1). Plaintiffs have met their burden with respect to both classes. The Due Process class includes over 11,000 individuals (2d Varon Decl. Ex. A), and the Equal Protection class includes at least 800 persons (Vaughn Decl. ¶¶ 7-8; *see also* Reply to Cert. Mot. at 9). This element is clearly satisfied.[13]

### b. Commonality

Rule 23(a)(2) requires the court to find that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 131 S. Ct. at 2551 (quoting *Falcon*, 457 U.S. at 157). The class members' "claims must depend upon a common contention . . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its

---

[13] Defendant disputes numerosity as to the Due Process class by arguing that the class should be limited to "enrollees who appealed their disenrollment but were not reinstated to coverage despite being eligible under the Bridge Waiver." (Resp. to Cert. Mot. at 13.) Defendant cites no authority for this position, and the court sees no reason to limit the class in this way given that Plaintiffs' claimed due process violation does not depend on whether a class member appealed disenrollment. *See supra*, § II(A)(3)(a).

1  truth or falsity will resolve an issue that is central to the validity of each one of the claims

2  in one stroke." *Id.* It is not necessary that members of the proposed class "share every

3  fact in common or completely identical legal issues." *Hayes*, 591 F.3d at 1122. Rather,

4  the "existence of shared legal issues with divergent factual predicates is sufficient, as is a

5  common core of salient facts coupled with disparate legal remedies within the class."

6  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

7  ### i. Due Process Class

8  Plaintiffs contend that Due Process class members' claims stem from the same

9  conduct and raise the same legal questions, including: (1) "whether [the] HCA violated

10  class members' constitutional right to due process of law by sending them notices which

11  did not satisfy due process requirements prior to terminating their Basic Health benefits";

12  (2) "whether class members are entitled to declaratory relief under 42 U.S.C. § 1983";

13  and (3) "whether class members are entitled to preliminary and permanent injunctive

14  relief." (Cert. Mot. at 7; *see also* 2d Am. Compl. ¶ 17.) The court concurs that these

15  questions apply to all Due Process class members. All class members were offered the

16  same process prior to the termination of their Basic Health benefits. They each received

17  the Disenrollment Notice, and therefore, they each received the same explanation of why

18  their benefits were being terminated and how they could appeal. If the court ultimately

19  determines that this process was insufficient, then it was insufficient as to all class

20  members. The court, therefore, concludes that Plaintiffs have affirmatively demonstrated

21  that "there are questions of law or fact that are common to the class." Fed. R. Civ. P.

22  23(a)(2).

1    Defendant contends that the law applies differently to legal residents and illegal

2   residents, as well as to class members who are currently ineligible for Basic Health solely

3   because of the five-year bar and those who are ineligible for other reasons.  (Resp. to

4   Cert. Mot. at 11-12.)  Defendant, however, fails to explain why this is the case.  To the

5   extent that Defendant's argument rests on the assumption that the existence of a property

6   interest depends on eligibility under the Bridge Waiver, Defendant is mistaken.  *See*

7   *supra*, § II(A)(3)(c) (explaining why Due Process class members have a property interest

8   regardless of whether they are eligible under the Bridge Waiver).  The court, moreover,

9   can discern no reason why the law concerning the due process sufficiency of the HCA's

10  notice would apply differently to class members who are ineligible solely because of the

11  five-year bar and class members who are ineligible for other reasons.  Accordingly, the

12  court concludes that Plaintiffs have met their burden to established commonality as to the

13  Due Process class.

### ii.  Equal Protection Class

15    Plaintiffs contend that, like the Due Process class, the Equal Protection class's

16  claims arose out of the same conduct and involve the same legal questions, namely: (1)

17  "whether [the] HCA violated class members' constitutional right to equal protection . . .

18  by terminating their Basic Health benefits, while continuing to provide Basic Health

19  benefits to U.S. citizens and certain qualified aliens who meet the requirements adopted

20  in ESHB 1086 and in RCW 70.47.020(9)(viii)"; (2) "whether class members are entitled

21  to declaratory relief under 42 U.S.C. § 1983"; and (3) "whether class members are

22  entitled to preliminary and permanent injunctive relief."  (Cert. Mot. at 7; *see also* 2d

Am. Compl. ¶ 18.)  The court agrees that these questions are common to all Equal Protection class members.  All Equal Protection class members were disenrolled because they are not Transition Eligible.  If the State's conditioning of Basic Health benefits on Transition Eligibility violates the equal protection clause, then all Equal Protection class members will have been disenrolled for a constitutionally impermissible reason.  *See Dukes*, 131 S. Ct. at 2551 (explaining that the common legal issues must be capable of classwide resolution).  These facts establish commonality as to the Equal Protection class.

### c.  Typicality

Typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  It is not necessary that the class representatives' injuries be identical to all class members' injuries, "only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct."  *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504-05 (2005).

### i.  Due Process Class

Plaintiffs contend that their claims and defenses are typical of Due Process class members' claims and defenses because the cause of action stems from the method in which all class members were disenrolled from Basic Health.  (Cert. Mot. at 8.)  As explained *supra*, section II(A)(3), members of the Due Process class suffered the same

alleged injury, which resulted "from the same, injurious course of conduct." *Armstrong*, 275 F.3d at 869. Because Plaintiffs and Due Process class members suffered the same injury, their claims are typical of absent class members. As such, Plaintiffs have met their burden to establish typicality.[14]

Defendant argues that Plaintiffs' claims are not typical of all class members because the property interest analysis for the due process violation is different for persons who are legally residing in the United States and those who are not legal residents. (Resp. to Cert. Mot. at 12.) This is essentially the same argument Defendant advanced in opposing justiciability and commonality. The property interest analysis, however, is the same for all Due Process class members, regardless of whether the class member is a lawful or unlawful resident. *See supra*, § II(A)(3)(c); *see also infra*, § II(B)(2)(a)(i).

### ii. Equal Protection Class

Plaintiffs argue that typicality as to the Equal Protection class is established by the fact that their claims arose because they were disenrolled from Basic Health based on their immigration status. (Cert. Mot. at 8.) The court agrees that Plaintiffs' alleged injuries are the same as Equal Protection class members' alleged injuries—termination of their Basic Health benefits for a constitutionally impermissible reason—and that these injuries stemmed from the State's amendment of the Basic Health eligibility

---

[14] The fact that Plaintiffs appealed their disenrollment while other class members did not, does not change this analysis. Plaintiffs' interests align with class members who did not appeal their disenrollment because they suffered the same injury and therefore have the same claims. *See supra*, § II(A)(3)(a) (explaining why class members who did not appeal have the same injury as class members who did appeal).

requirements.  These facts establish typicality.  *See Armstrong*, 275 F.3d at 869

(explaining that typicality requires a similar injury resulting from the same course of

conduct).[15]

### d.  Adequacy

In determining whether Plaintiffs and proposed class counsel will adequately

represent the proposed classes, the court must consider whether they have "any conflicts

of interest with other class members, and whether they will prosecute the action

vigorously on behalf of the class."  *Hanlon*, 150 F.3d at 1020.

### i.  Adequacy of Plaintiffs as Class Representatives

As an initial matter, the court concludes that Plaintiffs have not met their burden to

establish that Ms. Ponomareva is an adequate representative for either class.  Rule 23(a)

requires class representatives to be class members.  Fed. R. Civ. P. 23(a) ("One or more

*members of a class* may sue or be sued as representative parties . . . ." (emphasis added)).

Ms. Ponomareva is Transition Eligible and has been reenrolled in Basic Health

(McKinzie Decl. ¶¶ 5-8); therefore, she is no longer a member of either proposed class.

Relying on *Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993), Plaintiffs contend that class

certification should relate back to the filing of the Complaint, at which time Ms.

Ponomareva was disenrolled from Basic Health.  *Robidoux* stands for the proposition that

when "class claims are inherently transitory" and all of the named plaintiffs' claims have

been mooted, "certification may be deemed to relate back to the filing of the complaint in

---

[15] Defendant contested typicality only as to future class members.  The court has
excluded these individuals from the class, thus Defendant's arguments are moot.

order to avoid mooting the entire controversy." *Id.* at 939. *Robidoux*, however, is inapplicable here because the exclusion of Ms. Ponomareva does not moot the case, as Plaintiffs' counsel conceded at oral argument. The court, therefore, declines to appoint Ms. Ponomareva as a class representative.

With respect to the remaining Plaintiffs, however, the court concludes that adequacy is satisfied. They have declared that they have no conflict of interest and that they understand their responsibility to protect the interests of all class members. (Unthaksinkun Decl. ¶ 14; Atif Decl. ¶ 17; Ahmadi Decl. ¶ 17; S.J. Decl. ¶ 17.) Defendant does not assert any reason to dispute this. Ms. Unthaksinkun, Ms. Ahmadi, Ms. Atif, and Ms. S.J. ("Class Representatives") are appropriate representatives for both the Due Process and Equal Protection classes.

### ii. Adequacy of Counsel

The court concludes that Class Representatives have met their burden to show that their counsel are adequate to represent the Due Process and Equal Protection classes. Each is a highly qualified attorney who has class action experience, is prepared to represent Class Representatives and class members, and does not have a conflict of interest with Class Representatives or other class members. (*See generally* Declaration of Blake Marks-Dias (Dkt. # 5); Declaration of Michael Pierson (Dkt. # 6); Declaration of Daniel Gross (Dkt. # 8); Declaration of Janet Varon (Dkt. # 9).) Defendant, moreover, does not dispute their adequacy.

### 5. Rule 23(b) Requirements

In addition to meeting the Rule 23(a) criteria, the party seeking certification must also fall into one of three categories in Rule 23(b). *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001). Class Representatives seek class certification under Rule 23(b)(2) on the basis that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the 'indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 131 S. Ct. at 2557 (internal citation omitted). "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.*

Class Representatives have met their burden with respect to the Due Process class because Defendant offered the same process to all class members. Each class member received the Disenrollment Notice. If this notice did not comply with due process, then all class members received constitutionally insufficient notice. Any final relief correcting the deficiencies in this notice, therefore, would apply equally to all class members. Similarly, the Equal Protection class satisfies the Rule 23(b)(2) requirements. These individuals suffered the same harm, that is, termination of their benefits because of their immigration status. If the court finds that the current Basic Health eligibility

requirements impermissibly discriminate on the basis of alienage, then all class members will deserve the same injunctive relief.

### 6. Definitions of Certified Classes

Based on the foregoing analysis, the court certifies (1) the Due Process class, defined as all Washington state residents who were sent notices by the HCA informing them that their Basic Health benefits would be terminated effective March 1, 2011 because of their immigration status and who have not subsequently had their Basic Health benefits reinstated;[16] and (2) the Equal Protection class, defined as all Washington residents who are immigrants lawfully present in the United States whose Basic Health benefits terminated effective March 1, 2011 because of their immigration status and who have not subsequently had their benefits reinstated.

## B. Motion for Preliminary Injunction (Dkt. #32)

Class Representatives seek a preliminary injunction requiring the "HCA to immediately reinstate all previously enrolled immigrants' benefits while this matter is litigated, to continue enrollment for all legal immigrants who are otherwise eligible, to restore coverage for eligible medical care received since March 1, 2011, and to prevent [the] HCA from terminating class members' benefits again without constitutionally

---

[16] The court exercises its discretion to modify Class Representatives' proposed definition of the Due Process class, which defined the class as "all Washington state residents who were sent notices by HCA informing them that their Basic Health benefits would be terminated effective March 1, 2011 because of their immigration status and have not subsequently had their Basic Health benefits *unconditionally* reinstated" (Cert. Mot. at 2 (emphasis added)). The use of the word "unconditional" in inappropriate because Basic Health benefits are conditioned on numerous factors, including the payment of a monthly premium.

1　adequate notice." (Inj. Mot. at 32.) Defendant contends that a preliminary injunction is

2　inappropriate. (*See generally* Resp. to Inj. Mot. (Dkt. # 38).) The court concludes that

3　Class Representatives have established that they are entitled to preliminary injunctive

4　relief. The court grants in part and denies in part Class Representatives' motion (Dkt. #

5　32) and orders preliminary injunctive relief as set forth *infra*, section II(B)(6).

6　　　　**1. Preliminary Injunction Standard**

7　　　　"[A] preliminary injunction is an extraordinary and drastic remedy, one that

8　should not be granted unless the movant, by a clear showing, carries the burden of

9　persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). To obtain a preliminary

10　injunction, the moving party must demonstrate "that he is likely to succeed on the merits,

11　that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

12　balance of equities tips in his favor, and that an injunction is in the public interest."

13　*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24-25 (2008). So long as all four

14　parts of the *Winter* test are applied, "a preliminary injunction [may] issue where the

15　likelihood of success is such that 'serious questions going to the merits were raised and

16　the balance of hardships tips sharply in [plaintiff's] favor.'" *Alliance for the Wild*

17　*Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (quoting *Clear Channel*

18　*Outdoor, Inc. v. City of L.A.*, 340 F.3d 810, 813 (9th Cir. 2003)). In other words, the

19　"serious questions" approach survives *Winter*, so long as the plaintiff also shows that

20　there is a likelihood of irreparable injury and that the injunction is in the public interest.

21　*Id.* at 1135.

22

### 2. Likelihood of Success on the Merits

#### a. Due Process Claim

Whether Class Representatives are likely to succeed on the merits of their due process claim involves a two step inquiry: first, whether there is a protected property interest at issue; and if so, whether the process used to take away the property interest was constitutionally sufficient. *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 716 (9th Cir. 2011); *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588-89 (9th Cir. 1998). As explained below, the court concludes that Class Representatives have established a likelihood of success on the merits of their due process claim.

#### i. Property Interest

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it." *Id.* at 577. A person "must, instead, have a legitimate claim of entitlement to it." *Id.* Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules." *Id.* at 578. In the public benefits arena, courts have found that property interests exist in, among other things, welfare benefits, *Goldberg v. Kelly*, 397 U.S. 254 (1970); housing assistance, *Geneva Towers Tenants Org. v. Federated Mortg. Investors*, 504 F.2d 483 (9th Cir. 1974), *Ressler v. Pierce*, 692 F.2d 1212, 1215-16 (9th Cir. 1982), and *Nozzi v. Housing Auth. of the City of L.A.*, No. 09-55588, 2011 WL 1167188 (9th Cir. Mar. 25,

2011); social security disability benefits, *Mathews v. Eldridge*, 424 U.S. 319 (1976), and

*Kildare v. Saenz*, 325 F.3d 1078 (9th Cir. 2003); and supplemental food benefits,

*Alexander v. Polk*, 750 F.2d 250 (3d Cir. 1984).[17]

"[N]ot every statute authorizing a benefit creates a property interest." *Doyle v. City of Medford*, 606 F.3d 667, 672 (9th Cir. 2010). "A regulation granting broad discretion to a decision-maker does not create a property interest." *Id.* (quoting *Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir. 1980) (holding that statute permitting denial of "any application [for a landlord license] for any cause deemed reasonable" did not create a property interest.) Rather, the existence of "a property interest will depend largely upon the extent to which the statute contains mandatory language that restricts the discretion of the decisionmaker." *Id.* (quoting *Allen v. City of Beverly Hills*, 911 F.2d 367, 370 (9th Cir. 1990) (internal quotation marks and brackets omitted in *Doyle*); *see also Foss*, 161 F.3d at 588 (holding that an applicant for a federal fishing quota permit had a property interest in the permit because the eligibility requirements did not contain any open-ended discretionary factors); *Griffeth v. Detrich*, 603 F.2d 118, 121 (9th Cir. 1979) (holding that a state statute, coupled with its implementing regulations, created a property interest in general relief benefits because the regulations "set forth specific objective eligibility criteria for receipt of aid").

---

[17] The court has found no cases addressing whether a there is a property interest in state subsidized private health insurance for low-income individuals, nor have the parties cited any.

Class Representatives assert that the HCAA and the Basic Health regulations create a property interest in Basic Health because they contain mandatory, non-discretionary language regarding eligibility.  (Reply to Inj. Mot. (Dkt. # 46) at 6-8.)  Defendant argues that there is no property interest at stake because he can disenroll members to prevent overexpenditure.  (Resp. to Inj. Mot. at 19.)  For the reasons explained below, the court agrees with Class Representatives.

The HCAA greatly restricts the discretion of the HCA administrator.  For example, the HCAA states, "On or after July 1, 1988, the administrator *shall* accept for enrollment applicants eligible to receive covered basic health care services from the respective managed health care systems which are then participating in the plan."  RCW 70.47.080 (emphasis added).  The HCA must review Basic Health applications within thirty days of their receipt and notify eligible candidates of their enrollment date.  WAC 182-24-060(5).  Eligibility is defined by a number of non-discretionary criteria.  RCW 70.47.020(9); WAC 182-24-020(1).  Regulations also govern the order in which applicants will be enrolled in Basic Health or, when necessary, added to the waiting list.  WAC 182-24-060(6); WAC 182-24-020(4)(c).  The HCA administrator may disenroll a member for one of only seven reasons which constitute "good cause," WAC 182-24-070(2), or to prevent overexpenditure, RCW 70.47.060(6).  These provisions significantly restrict the discretion of the decisionmaker, thereby creating a likelihood that class members have a property interest in Basic Health benefits.

These facts are distinguishable from those in *Allen*, upon which Defendant relies to argue that there is no property interest in Basic Health benefits.  (Resp. to Inj. Mot. at

19.) The plaintiff in *Allen* claimed a property interest in his position as a city attorney, which had been eliminated. *Allen*, 911 F.2d at 370. The governing municipal code authorized the city council to "abolish any position" whenever "necessary in the interests of economy or because the necessity for a position no longer exists." *Id.* The court found that the city's broad discretion to eliminate jobs created only a unilateral expectation in continued employment. *Id.* at 371. In contrast, the HCA administrator has only limited discretion to disenroll Basic Health members to prevent overexpenditure. He or she may not take such action absent a risk of overexpenditure, whereas in *Allen* the city could terminate any position at any time to save money, regardless of whether the city was over budget. *Allen* is not controlling here.

Moreover, courts have generally held that limited funding does not destroy a legitimate claim of entitlement to benefits. *See, e.g.*, *Alexander v. Polk*, 750 F.2d 250, 260-61 (3d Cir. 1984) (holding that the plaintiffs had a property interest in receiving supplemental food benefits despite the limited availability of benefits); *Weston v. Cassata*, 37 P.3d 469, 476-77 (Colo. App. Ct. 2001) (holding that property interest existed in welfare benefits regardless of limited federal funding); *cf. Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 36-37 (D.C. Cir. 1997) (finding no property interest in emergency shelter assistance where there were no regulations establishing procedures for a waiting-list for the scarce shelter space). As the court in *Alexander* explained, when a statutory scheme creates a property interest, "[t]he existence of adequate funding simply imposed an additional condition on the receipt of benefits"; it does not alter the nature of the statutorily conferred property right. *Alexander*, 750 F.2d

1   at 261.  The court agrees with the Third Circuit's reasoning in *Alexander* and concludes

2   that the HCAA likely creates a property interest in Basic Health benefits, regardless of

3   funding limitations.

### ii.  Sufficiency of Notice

5   "Once it is determined that due process applies, the question remains what process

6   is due."  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  "At a minimum, the

7   Constitution requires notice and some opportunity to be heard."  *Mallette v. Arlington*

8   *Cnty. Emps.' Supplemental Ret. Sys. II*, 91 F.3d 630, 640 (4th Cir. 1996) (citing *Joint*

9   *Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 178 (1951) ("Notice and

10  opportunity to be heard are fundamental to due process of law.")).  Above this threshold,

11  "the required procedures may vary according to the interests at stake in a particular

12  context."  *Brock v. Roadway Exp., Inc.*, 481 U.S. 252, 261 (1987).  The Ninth Circuit has

13  explained that "[d]ue process requires notice that gives an agency's reason for its action

14  in sufficient detail that the affected party can prepare a responsive defense."  *Barnes v.*

15  *Healey*, 980 F.2d 572, 579 (9th Cir. 1992) (citing *Goldberg v. Kelly*, 397 U.S. 254, 267-

16  68 (1970)).  Due process also requires "the opportunity to be heard at a meaningful time

17  and in a meaningful manner."  *Brock*, 481 U.S. at 261 (quoting *Mathews v. Eldridge*, 424

18  U.S. 319, 333 (1976)).  In short, "[d]ue process is flexible and calls for such procedural

19  protections as the particular situation demands."  *Mathews*, 424 U.S. at 334 (quoting

20  *Morrissey*, 408 U.S. at 481).

21  Class Representatives argue that the process they received was insufficient for two

22  reasons.  First, Class Representatives assert that the Disenrollment Notice did not apprise

class members of their right to request and receive continued benefits pending an appeal of their disenrollment.  (Inj. Mot. at 14-15.)  Second, they contend that the Disenrollment Notice "failed to give Plaintiffs a meaningful individualized explanation of the reason for and information justifying [the] HCA's termination of their Basic Health benefits that could enable them to decide whether to appeal the termination and prepare an adequate appeal."  (*Id.*)  The court concludes the notice was likely insufficient.

## (1) Right to Request Continued Benefits

Class Representatives assert that class members received insufficient process because the HCA did not automatically provide continued benefits pending an appeal or notify class members of their right to request continued benefits pending appeal.  (Inj. Mot. at 19-20.)  Defendant responds that (1) the HCA did not need to automatically provide continuing benefits because neither the HCAA nor the applicable regulations provide for such action; and (2) the HCA did not need to specifically notify individuals of their right to request continuing benefits because this right is set forth in the Washington Administrative Code and knowledge of Basic Health rules is imputed to members. (Resp. to Inj. Mot. at 24.)  The court concludes that although Class Representatives have not established that due process requires automatic continuing benefits, they have shown that due process likely requires the HCA to provide notice of their right to request continued benefits.

As a general rule, a benefit recipient must have an opportunity to respond to a proposed termination before his or her property interest in the benefit is revoked.  *See, e.g.*, *Mathews*, 424 U.S. at 333 ("This Court consistently has held that some form of

hearing is required before an individual is finally deprived of a property interest.").  A

pre-termination hearing is required because the "termination of aid pending resolution of

a controversy over eligibility may deprive an *eligible* [welfare benefits] recipient of . . .

the very means by which to live while he waits." *Goldberg*, 397 U.S. at 264 (emphasis in

original).  "This principle has been incorporated into the federal regulations regarding

hearing requirements for [state-administered federal benefits] programs." *Schroeder v.*

*Hegstrom*, 590 F. Supp. 121, 130 (D. Or. 1984).  Regulations governing the Social

Security Act, for example, require agencies to mail a termination notice only ten days

before taking action, but the notice must include an explanation of how the recipient may

receive continued assistance if a hearing is requested. *See, e.g.*, 45 C.F.R. §

205.10(a)(4)(i).  In such circumstances, "[a]n opportunity for reinstatement of benefits

pending a hearing decision amounts to an opportunity for a pre-reduction or pre-

termination hearing." *Schroeder*, 590 F. Supp. at 130; *see also Stenson v. Blum*, 476 F.

Supp. 1331, 1342 (S.D.N.Y. 1979) (holding that federal regulations requiring notice of

the opportunity to request benefits pending an appeal comply with due process).

The regulations governing Basic Health, like the regulations governing the Social

Security Act, allow the HCA administrator to disenroll members by sending notice at

least ten days before the date of disenrollment.  WAC 182-24-070(4).  The Basic Health

regulations also allow for continued benefits during an appeal, but, unlike the federal

regulations, they do not expressly require the notice of disenrollment to explain how a

recipient may receive these benefits.  *See* WAC 182-24-070.  If, however, recipients do

not know that they must request continued benefits, then effectively they are deprived of

1  their right to a pre-termination opportunity to respond.  The court, therefore, concludes

2  that due process likely requires any disenrollment notice to explain how to receive

3  continuing benefits.  *Cf. Stenson*, 476 F. Supp. at 1342 (holding that compliance with

4  federal regulations that include notifying recipient of right to request continuing benefits

5  satisfies due process).  The Disenrollment Notice did not contain such an explanation,

6  and thus Class Representatives have established a likelihood that the process they

7  received was insufficient in this manner.

8          Even assuming, *arguendo*, that knowledge of the Basic Health administrative rules

9  is imputed to members as Defendant contends (without citation), the administrative rules

10  regarding continued benefits do not plainly indicate that a disenrolled member must

11  request continued benefits or explain how to do so.  The applicable rule provides:

12          Enrollees who appeal a disenrollment decision that was based on eligibility
           issues and not related to premium payments *may* remain enrolled during the
13          appeal process, provided: (a) The appeal was submitted according to the
           requirements of this section; and (b) The enrollee: (i) Remains otherwise
14          eligible; (ii) Continues to make all premium payments when due; and (iii)
           Has not demonstrated a danger or threat to the safety or property of the
15          MHCS or health care authority or their staff, providers, patients or visitors.

16  WAC 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(8) (emphasis added).  The rule ambiguously states that an individual

17  "may" remain enrolled pending an appeal, but it does not explain how to receive these

18  benefits.  *Id.*  Based on the language of the rule, it would not be unreasonable for an

19  individual who meets all of the requirements of the rule to assume that he or she would

20  continue to receive benefits.  The HCA, however, appears to have interpreted the rule to

21  require an individual to request ongoing benefits (Resp. to Inj. Mot. at 24), even though

22  the rule is silent on the issue.  The fact that the HCA's interpretation of the rule is not

ORDER- 42

apparent from the rule's plain language lends further support to the court's conclusion that the HCA must affirmatively notify disenrolled individuals of their right to request continued benefits.

### (2) Sufficiency of the Disenrollment Notice

In determining whether the Disenrollment Notice was constitutionally sufficient, the court considers the three factors that the Supreme Court set forth in *Mathews*: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

### a. Private Interest

The parties dispute the nature of the private interest that was affected by the Defendant's action. Class Representatives contend that they "have a strong interest in maintaining needed health care coverage they cannot otherwise afford." (Reply to Inj. Mot. at 8 (citing *Mathews*, 424 U.S. at 340.) Defendant frames the issue more narrowly, asserting that their "interest is in avoiding an erroneous disenrollment based on [the] HCA's application of the eligibility requirements of the Bridge Waiver." (Resp. to Inj. Mot. at 21.) The court agrees with Class Representatives' framing of their interest. In *Mathews*, the Court noted that the plaintiff, whose social security benefits had been terminated, had an interest "in the uninterrupted receipt of this source of income pending final administrative decision on his claim." *Mathews*, 424 U.S. at 340. Similarly, in this

case, Class Representatives have an interest in maintaining subsidized health insurance; they do not merely have an interest in avoiding an erroneous disenrollment.

The court concludes that Class Representatives have established that the private interest of Due Process class members in retaining subsidized health insurance is high. Class Representatives have each detailed the importance of Basic Health in their lives and their inability to afford alternative health insurance. (*See, e.g.*, Unthaksinkun Decl. ¶ 6.) The Ninth Circuit, moreover, has recognized the general importance of healthcare. *See, e.g.*, *Veterans for Common Sense v. Shinseki*, 644 F.3d 845, 874 (9th Cir. 2011) (agreeing with the district court's conclusion that "the private interest of veterans in receiving health care is high"); *Knudson v. City of Ellensburg*, 832 F.2d 1142, 1148 (9th Cir. 1987) (holding that the plaintiff, whose disability benefits were denied without a hearing, had a "significant interest in the uninterrupted payment of her medical expenses pending determination of her claim").

### b. Risk of Erroneous Deprivation and Value of Additional Procedures

The court begins its analysis of the risk of erroneous deprivation by reiterating the requirement that a constitutionally sufficient notice must explain the reason for an agency's action in enough detail that the recipient can prepare a meaningful appeal. *Barnes*, 980 F.2d at 579. The information provided must allow the recipient to assess the accuracy of the agency's action and correct any mistake on appeal. *See Rodriguez v. Chen*, 985 F. Supp. 1189, 1190 (D. Ariz. 1996) (holding that notice terminating Medicaid benefits did not sufficiently inform the applicant of the reason for the adverse decision

such that the applicant could evaluate the accuracy of the decision and adequately contest it on appeal); *Avanzo v. R.I. Dep't of Human Servs.*, 625 A.2d 208, 210 (R.I. 1993) (holding that form notices used to terminate benefits were insufficient where they "did not contain individualized reasons [for the termination] applicable to the recipient"). If the notice does not provide enough information for the recipient to meaningfully appeal, then there is an increased risk of erroneous deprivation.

Class Representatives assert several reasons why the Disenrollment Notice was insufficient: (1) the Disenrollment Notice did not provide an individualized explanation for why each recipient did not meet the new immigration status requirements; (2) the Disenrollment Notice provided the wrong reason for disenrollment, which prevented recipients from preparing a meaningful appeal; and (3) the Disenrollment Notice included an inaccurate citation to the law supposedly governing the termination of benefits, further compounding the error caused by offering the wrong reason for disenrollment. (Inj. Mot. at 14-19.)

In response, Defendant asserts that the fact that over 4,000 individuals successfully appealed their disenrollment establishes that the Disenrollment Notice included sufficient information to allow recipients to meaningful appeal. (Resp. to Inj. Mot. at 22.) Defendant contends that the HCA was unable to include an individualized reason why the recipient did not meet the new eligibility requirements because it had no information upon which to make this determination. (*Id.*) Furthermore, Defendant argues that by asking recipients to submit proof of legal residence (a condition precedent to Bridge Waiver eligibility) on appeal, the HCA would be able to determine Bridge

Waiver eligibility. (*Id.* at 23 (citing Longhorn Decl. ¶ 10).) Finally, Defendant defends the citation it included in the Disenrollment Notice and asserts that no substitute citation was necessary. (*Id.*)

The court concludes that Class Representatives have established a likelihood that the Disenrollment Notice did not provide enough information for recipients to meaningfully appeal, thereby creating a risk of erroneous deprivation. The court finds the Rhode Island Supreme Court's decision in *Avanzo* particularly instructive. Like in the instant case, the plaintiffs in *Avanzo* challenged the procedures that were used to disenroll them from a state-funded disability benefits program after the state tightened eligibility requirements. *Avanzo*, 625 A.2d at 209. The old program provided benefits for individuals who submitted proof that they could not perform full-time work, but the new requirements required proof that the recipient could not perform part-time work. *Id.* There were, however, certain exceptions to the part-time work rule. *Id.* To determine continued eligibility under the new program, the state reviewed each benefit recipient's file, and if there was insufficient information to establish continued eligibility, the state terminated the recipient's benefits. *Id.* at 210.

The state in *Avanzo* used a pre-printed, standardized disenrollment notice which did not explain the new eligibility standards or provide an individualized reason why the recipient did not qualify. *Id.* at 209-10. In particular, the notice did not explain the exceptions to the new requirement that the recipient be unable to perform part-time work. *Id.* at 210. The new regulations, moreover, only had been published once in the Providence Journal, therefore recipients were unaware of the change in standards. *Id.* at

209, 211.  Given this lack of necessary information, the court held that the notice

rendered any appeal hearing "less than meaningful."  *Id.* at 211.

    *Avanzo* is strikingly similar to the instant case.  In both cases, the states tightened

eligibility requirements but did not make the new requirements widely known.  Similar to

the notice in *Avanzo*, the Disenrollment Notice did not explain the new eligibility

requirements and its exceptions, or include a citation to the relevant sections of the

PRWORA, 18 U.S.C. §§ 1613, 1641.  Furthermore, the State Legislature did not pass the

statute codifying the new requirements until two months after the HCA disenrolled class

members.  (*See* Resp. to Inj. Mot. at 23.)  As such, class members had no way of knowing

all of the ways in which they could have established their eligibility.  Because class

members did not know the new eligibility requirements, they could not meaningfully

appeal, as the court in *Avanzo* explained.  *Avanzo*, 625 A.2d at 211.

    Defendant contends that the Disenrollment Notice directed recipients to produce

proof of lawful residence, and that if they submitted such evidence, the HCA would be

able to accurately determine eligibility.  (Resp. to Inj. Mot. at 23.)  Defendant has not

submitted any evidence, however, that supports this proposition,[18] and in fact the record

demonstrates the opposite.  As Ms. Ponomareva's experience shows, proof of legal

residence is insufficient to accurately determine Transition Eligibility.  Ms. Ponomareva

qualifies for an exception to the five-year bar because she is married to a veteran, but the

_____

[18] Defendant's citation to the Longhorn Declaration is unavailing.  The particular
paragraph that Defendant cited explained the disenrollment-related activities of the HCA on
February 18, 2011.  (Longhorn Decl. ¶ 10.)  Nowhere does Mr. Longhorn state that the HCA
could determine eligibility with only proof of lawful residence.  (*See generally id.*)

Disenrollment Notice did not notify her of this exception.  (Ortego Decl. (Dkt. # 33) ¶ 9.)

She did not learn that she was Transition Eligible until her husband sought legal advice.

(*Id.*)  In fact, the appeals officer at Basic Health who handled her claim did not know that

the applicable exception existed until Ms. Ponomareva's husband brought it to her

attention.[19]  (*Id.* ¶¶ 10-11; McKinzie Decl. ¶ 5.)  Although Ms. Ponomareva has now

been reinstated in Basic Health with the help of her lawyer, her story exemplifies the risk

of erroneous deprivation that was created by the inadequacy of the Disenrollment Notice.

     The court must also consider the probable value of additional procedures.

*Mathews*, 424 U.S. at 335.  Based on the foregoing analysis, the court concludes that

Class Representatives have shown that additional notice that complies with due process

likely would be valuable to correct the risk of erroneous deprivation.

### c.  Government's Interest

     The final *Mathews* factor involves consideration of "the administrative burden and

other societal costs that would be associated with requiring" the additional procedures.

*Mathews*, 424 U.S. at 347.  The court concludes that the government has a strong interest

in conserving limited financial resources.  (*See* Resp. to Inj. Mot. at 25.)  The court

agrees with Defendant that providing additional procedures would entail a significant

outlay of administrative and financial resources.  (*Id.*)

---

[19] The checklist that HCA appeals officers used to determine Transition Eligibility did not include the veteran-spouse exception, and also lacked other relevant information regarding eligibility.  (*See generally* Baron Decl. (Dkt. # 48).)

### d. Weighing the *Mathews* Factors

After weighing the three *Mathews* factors, the court concludes that Class

Representatives are likely to prevail on their due process claim.  Class members' need for

subsidized health insurance and the proven risk of erroneous deprivation likely outweigh

the government's interest in conserving limited resources.  *See Dominguez v.*

*Schwarzenegger*, 596 F.3d 1087, 1098 (9th Cir. 2010), *cert. granted sub nom Maxwell-*

*Jolly v. Cal. Pharmacists Ass'n*, 131 S. Ct. 992 (2011).   Based on the record before it,

the court is not convinced that additional procedures would be futile or duplicative, as

Defendant contends (Resp. to Inj. Mot. at 25).  Taking into account the foregoing analysis

regarding the right to continuing benefits and the risk of erroneous deprivation, the court

concludes that a second notice would likely remedy the constitutional violation by (1)

including an individualized explanation of why the HCA has concluded that the

individual is no longer eligible; (2) properly describing the eligibility requirements so that

a recipient can submit the relevant proof of eligibility and/or including citations to the

applicable statutory provisions; and (3) setting forth the recipient's right to request

continuing benefits pending appeal, provided the recipient complies with WAC 182-22-

320(8).[20]

---

[20] In his brief, Defendant stated that if an "appeal is ultimately unsuccessful, the member is not only responsible for paying the regular premiums, but also for the full price of all medical costs incurred during the appeal."  (Resp. to Inj. Mot. at 24.)  Defendant does not cite the regulation providing for this recoupment of costs, however, if the HCA may lawfully enforce recoupment of premiums and medical expenses, class members should receive this important information, as well.

### b. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "It has long been settled, and it is not disputed here, that the term 'person' in this context encompasses lawfully admitted resident aliens as well as citizens of the United States." *Graham v. Richardson*, 403 U.S. 365, 370 (1971). Federal laws discriminating on the basis of alienage, nevertheless, are given great deference because Congress has broad powers to regulate naturalization and immigration. *See Diaz*, 426 U.S. at 78-80. In contrast, state laws discriminating on the basis of alienage are subject to strict scrutiny and may only be upheld if they "advance a compelling state interest by the least restrictive means available." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984); *see also Pimentel v. Dreyfus*, No. C11-0119MJP, 2011 WL 321778, *5 (W.D. Wash. Jan. 28, 2011) ("[S]trict scrutiny is the default with respect to state classifications based on alienage."). If, however, "the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction." *Plyler v. Doe*, 457 U.S. 202, 219 n.19 (1982); *see also Sudomir v. McMahon*, 767 F.2d 1456, 1466 (9th Cir. 1985) (applying rational basis review to a state's use of federal eligibility requirements for benefits under the Aid to Families with Dependent Children program because Congress had created a uniform eligibility rule).

Class Representatives argue that Defendant discriminated against them and Equal Protection class members on the basis of alienage by terminating their benefits while

continuing to use state funds to pay for benefits for United States citizens and eligible

non-citizens.  (Inj. Mot. at 7.)  Class Representatives further contend that this

discrimination is subject to strict scrutiny because Congress, in passing the PRWORA,

did not establish a uniform rule for states to follow in providing state-funded benefits.

(*Id.* at 9-13.)  Defendant responds that members of the Equal Protection class were

classified based on their eligibility for federal Medicaid, not on the basis of their alienage.

(Resp. to Inj. Mot. at 14-17.)  Even if Equal Protection class members were classified on

the basis of alienage, Defendant asserts that rational basis review applies because the

State was following a uniform federal rule.  (*Id.* at 9-14.)

Class Representatives do not argue that they would prevail under rational basis

review, nor does Defendant contend that he would prevail under strict scrutiny.  The

outcome of this case, therefore, turns on the appropriate standard of review.  The court

must consider (1) whether Defendant employed a classification based on alienage; and

(2) if so, whether the PRWORA establishes a uniform rule.  As discussed below, the

court concludes that Class Representatives have established a likelihood that Defendant

employed a classification based on alienage and that the PRWORA does not establish a

uniform rule.  Accordingly, Defendant's decision to terminate Equal Protection class

members' benefits is subject to strict scrutiny, which it cannot withstand.  In sum, the

court concludes that Class Representatives are likely to succeed on the merits of their

equal protection claim.

## i.     Basis for Classification

The first issue is whether Defendant employed a classification based on alienage when he terminated Equal Protection class members' Basic Health benefits.  Class Representatives contend that the classification is based on alienage because the "HCA terminated Plaintiffs' and other legal immigrants' state-funded Basic Health benefits, while continuing to use state funds to pay for benefits for individuals it found to be U.S. citizens and eligible noncitizens."  (Inj. Mot. at 7.)  This analysis reflects the Supreme Court's reasoning in *Graham*.  The Court in *Graham* found that the challenged state benefits programs, which contained residency requirements for non-citizens, discriminated on the basis of alienage because they "create two classes of needy persons, indistinguishable except with respect to whether they are or are not citizens of this country."  *Id.* at 371; *see also Finch v. Commonwealth Health Ins. Connector Auth.*, 946 N.E.2d 1262, 275 n.16 (Mass. 2011) (presuming that the state employed a classification based on alienage when it adopted "the facially discriminatory PRWORA eligibility requirements").[21]

_____

[21] *See also Pimentel v. Dreyfus*, No. C11-119 MJP, 2011 WL 321778, at *5 (W.D. Wash. Jan. 28, 2011) (holding that state's decision to eliminate alien-only state-funded food assistance program while maintaining other assistance programs discriminated on the basis of alienage); *Korab v. Koller*, No. 10-00483 JMS/KSC, 2010 WL 4688824, at *7 (D. Haw. Nov. 10, 2010) (holding that state's decision to reduce health care benefits in an alien-only state-funded assistance program while maintaining other assistance programs discriminated on the basis of alienage); *Ehrlich v. Perez*, 908 A.2d 1220, 1234-35 (Md. 2006) (concluding that state's decision to cut benefits for certain aliens discriminated on the basis of alienage) *Aliessa ex. Rel. Fayad v. Novello*, 754 N.E.2d 1085, 1094 (N.Y. 2001) (holding that state's termination of state Medicaid benefits for non-qualified aliens discriminated on the basis of alienage).

Defendant argues that it is not "discrimination against a suspect class to convert from a state-funded program to a federal-state matching funds program that applies federal eligibility rules across the board to both aliens and citizens alike."[22] (Resp. to Inj. Mot. at 14.) Defendant relies primarily on *Hong Pham v. Starkowski*, 16 A.3d 635 (Conn. 2011).[23] *Hong Pham* involved Connecticut's decision to eliminate a state funded medical assistance program for legal immigrants who were ineligible for Medicaid because of the five-year bar. *Id.* at 637-38. The plaintiff claimed that this decision discriminated against her and other class members on the basis of their alienage and violated the Fourteenth Amendment. *Id.* at 638-39. The court held that the termination of the assistance program did not discriminate on the basis of alienage because "the program did not benefit citizens as opposed to aliens."[24] *Id.* at 646. The court went on to reject the plaintiff's contention that the state's decision to participate in a separate federal

---

[22] Defendant also argues that it was not discrimination against a suspect class to adopt the requirement of Transition Eligibility because the HCA also disenrolled persons based on age and income. (Resp. to Inj. Mot. at 15.) That the criteria the HCA adopted impacts individuals on bases other than alienage, however, does not mean that the criteria do not discriminate on the basis of alienage. *See Parents Involved in Comty. Schools v. Seattle School Dist. No. 1*, 551 U.S. 701 (2007) (finding that student assignment plan that relied on racial classification as one among several "tiebreaking" factors discriminated on the basis of race); *see also Finch*, 946 N.E.2d at 275 n.16 (noting that the PRWORA eligibility requirements are facially discriminatory).

[23] Defendant also relies on *Doe v. Commissioner of Transitional Assistance*, 773 N.E.2d 404 (Mass. 2002), in which the Massachusetts Supreme Court found that a residency requirement for an alien-only benefit program discriminated on the basis of residency, rather than alienage. *Id.* at 414. Like *Hong Pham*, *Doe* is factually distinguishable because it involved an alien-only program, while Basic Health has provided benefits to both citizens and aliens for over 20 years.

[24] The court questions this result. *See Pimentel*, 2011 WL 321778, at *5 (holding that elimination of an alien-only state-funded food assistance program while maintaining other food programs for citizens and others discriminated on the basis of alienage).

Medicaid program but not to provide equivalent benefits to those who are ineligible for Medicaid discriminated on the basis of alienage. *Id.* at 649. The court reasoned that "when a state chooses to participate in federal Medicaid, it does not necessarily choose to deny coverage to any particular groups of individuals on the basis of a suspect classification." *Id.* at 659. The court continued, "[I]nstead, the state's decision is based on the fact that these groups, among others, are ineligible for federal Medicaid, in accordance with federal law." *Id.* The court therefore concluded that the state's decision to participate in Medicaid drew a classification based on eligibility for Medicaid, not alienage. *Id.*

*Hong Pham* is distinguishable. There, the court addressed the question of whether the state discriminated on the basis of alienage by continuing to participate in a stand-alone Medicaid program without providing the same benefits to those who were Medicaid ineligible. *Id.* at 658. Here, by contrast, the issue is whether the State discriminated based on alienage when it chose to exclude Equal Protection class members from a program that has existed for over 20 years by applying facially discriminatory federal Medicaid standards. Indeed, the Bridge Waiver did not require the State to exclude Equal Protection class members, and in fact, it anticipated that the State would continue providing benefits to non-Transition Eligibles. (Bridge Waiver STC § II.) The court concludes that the State, in voluntarily using the Medicaid eligibility requirements to exclude Equal Protection class members from Basic Health, likely discriminated on the basis of alienage by creating "two classes of needy persons, indistinguishable except with respect to whether they are or are not citizens of this country." *Graham*, 403 U.S. at 371.

1 | ### ii. Uniform Rule

2      Because Defendant classified Equal Protection class members on the basis of

3 alienage, the court must determine whether strict scrutiny or rational basis review applies.

4 The appropriate standard of review depends on whether the PRWORA creates a uniform

5 rule. Defendant argues that the court should follow *Sudomir*, in which the Ninth Circuit

6 held that the Aid to Families with Dependent Children (AFDC) established a uniform

7 rule with respect to the treatment of asylum applicants. *Sudomir*, 767 F.2d at 1466. As

8 described below, the court concludes that *Sudomir* is instructive but distinguishable.

9      *Sudomir* involved an equal protection challenge to California's administration of

10 the joint federal-state AFDC program by individuals who did not qualify for AFDC

11 benefits because they had applied for but not yet been granted asylum. *Id.* at 1457. The

12 state argued that in administering the program, it merely adopted the federal

13 classification. *Id.* at 1465. The plaintiffs responded that the state applied a state

14 classification because federal law did not prevent the state from adopting more liberal

15 eligibility standards than the federal classification. *Id.* The court rejected this argument

16 because "[t]o so hold would amount to compelling the states to adopt each and every

17 more generous classification, which, on its face, is not irrational." *Id.* at 1466.

18 Accordingly, it concluded that the state employed a federal classification. *Id.* In

19 addition, the court found that the state employed a uniform federal policy regarding the

20 appropriate treatment of asylum applicants because the AFDC required the state to grant

21 benefits to certain individuals and deny benefits to others. *Id.*

22

1     Defendant contends that, "[a]s in *Sudomir*, Washington 'employed both a federal

2     classification *and* a uniform federal policy regarding the appropriate treatment of a

3     particular subclass of aliens.'" (Resp. to Inj. Mot. at 11 (quoting *Sudomir*, 767 F.2d at

4     1466).) The court disagrees. First, in adopting the PRWORA eligibility requirements for

5     Basic Health, the State employed a state classification, not a federal classification.

6     Unlike in *Sudomir*, in which the state had never provided solely state-funded benefits,

7     Washington State provided state-funded Basic Health benefits for over 20 years. The

8     State acted independently in adopting the PRWORA eligibility requirements for Basic

9     Health; the Bridge Waiver did not require this action. (Bridge Waiver STC § 2 (noting

10    that the State intended to continue providing state-funded benefits to non-Transition

11    Eligibles after adopting the Bridge Waiver).) Although Defendant claims that Basic

12    Health is now a joint federal-state program governed by federal law (Resp. to Inj. Mot. at

13    10), that is the case only because the State terminated Equal Protection class members—

14    the act that is as the center of this lawsuit.[25] This is distinctly different from the situation

15    in *Sudomir* where the state never provided state benefits in the first place.

16        Furthermore, contrary to Defendant's assertions, the PRWORA does not create a

17    uniform federal rule regarding state funded benefits programs. As the court in *Sudomir*

18    explained, a uniform rule exists where a federal statute requires states to both grant

19

20        [25] Moreover, rather than limiting enrollment to Transition Eligibles, the State could have
21    responded to budget cuts by disenrolling Basic Health members using non-discriminatory
      criteria. The program would have provided benefits to fewer individuals because some
      individuals would not be eligible for federal matching funds, but the program would not have
22    discriminated against a suspect class.

ORDER- 56

benefits to eligible persons and deny benefits to those who are not eligible. *Sudomir*, 767

F.2d at 1466; *see also Korab*, 2010 WL 4688824, at *9 - *10 (adopting *Sudomir*'s

framing of the uniformity rule). The PRWORA grants states discretion to "determine

eligibility for any State public benefits of an alien who is a qualified alien . . . , a

nonimmigrant under the Immigration and Nationality Act . . . , or an alien who is paroled

into the United States . . . for less than one year." 8 U.S.C. § 1622(a) (internal citations

omitted). Therefore, unlike the AFDC, which was at issue in *Sudomir*, the PRWORA

neither requires the State to use nor prevents the State from using state funds to provide

Basic Health benefits to Equal Protection class members. As such, it does not create a

uniform rule for states to follow. *See Pimentel*, 2011 WL 321778, at *4 (holding that the

PRWORA did not create a uniform rule); *Korab*, 2010 WL 4688824, at *9 - *10 ("By

failing to provide any guidance to states regarding how to choose among these options,

the PRWORA does not establish uniformity, but rather fosters a lack of uniformity

between the states based on the states' own considerations of who should receive benefits

based on alienage."); *Finch*, 946 N.E.2d at 1274-78 (applying strict scrutiny to the state's

termination of state-funded benefits program for immigrants because the PRWORA did

not create a uniform rule); *Erlich*, 908 A.2d at 1240 (holding that the PRWORA does not

establish a uniform rule); *Aliessa*, 754 N.E.2d at 1098 ("Considering that Congress has

conferred upon the States such broad discretionary power to grant or deny aliens State

Medicaid, we are unable to conclude that [the federal law] reflects a uniform national

policy.").

1    Despite the discretionary language contained in the PRWORA, two courts relied

2  on by Defendant applied rational basis review to state benefit eligibility requirements that

3  mirrored federal eligibility requirements.  (*See* Resp. to Inj. Mot. at 12-13 (citing *Soskin*

4  *v. Reinertson*, 353 F.3d 1242 (10th Cir. 2004), and *Cid v. S.D. Dep't of Soc. Servs.*, 598

5  N.W.2d 887 (S.D. 1999)).)  In *Soskin*, legal immigrants challenged a Colorado law that

6  terminated optional Medicaid coverage that the state had been providing to them.  *Soskin*,

7  353 F.3d at 1244.  The court concluded that a uniform rule was unnecessary to authorize

8  the state's action and held that states may follow a clearly expressed national policy

9  regarding the treatment of immigrants.[26]  *Id.* at 1254-57.  Because Congress set forth a

10 national policy regarding the treatment of immigrants in the PRWORA, the Tenth Circuit

11 applied rational basis review to Colorado's decision to terminate the optional Medicaid

12 coverage.  *Id.* at 1255.  Yet unlike the Tenth Circuit, the Ninth Circuit has not discarded

13 requirement that courts apply rational basis review to suspect classifications only where

14 Congress has established a uniform rule.  *See Sudomir*, 767 F.2d at 1466; *see also Korab*,

15 2010 WL 4688824, at *10 - *11 (distinguishing *Soskin* in light of *Graham* and *Sudomir*).

16 This court must follow the law in the Ninth Circuit, and therefore declines to adopt

17 *Soskin*'s reasoning.

18    Likewise, the court declines to follow the South Dakota Supreme Court in *Cid*.  In

19 *Cid*, the court held that the state's decision to terminate certain welfare benefits to legal

20

21    _____

   [26] The court agrees with the *Korab* court's conclusion that "*Soskin* relied on an unduly
22 restrictive interpretation of the uniformity requirement."  *Korab*, 2010 WL 4688824 at *11
   (distinguishing *Soskin* in light of *Graham* and *Sudomir*).

resident immigrants, following the enactment of the PRWORA, did not violate the equal

protection clause. *Cid*, 598 N.W.2d at 888. The court rejected the plaintiff's argument

that *Graham* required the court to apply strict scrutiny. *Id.* at 892. First, the court

reasoned that unlike in *Graham*, South Dakota did not pass a statute restricting the

plaintiffs' benefits, rather, it merely promulgated an administrative rule to implement

federal legislation. *Id.* Furthermore, the court observed that the rule was consistent with

the PRWORA, which courts had upheld under rational basis review. *Id.* The court

therefore applied rational basis review and upheld the regulation. *Id.* at 892-93.

The instant case is distinguishable from *Cid*. In contrast to the program in *Cid*,

Basic Health provided state-funded benefits to Equal Protection class members for many

years before it terminated their benefits, and no change in federal law or new federal

mandate required the HCA to take the challenged action. Moreover, like in *Graham*, the

State Legislature created Basic Health through statute, and did not merely promulgate an

administrative rule implementing federal legislation. Finally, the court in *Cid* did not

discuss or address *Plyler*'s uniform rule requirement. For these reasons, the court does

not follow *Cid*.

Because the court concludes that it is likely that the PRWORA did not create a

uniform rule regarding state funded benefits for Equal Protection class members, strict

scrutiny applies. A statutory classification that is subject to strict scrutiny must "be

suitably tailored to serve a compelling state interest." *City of Cleburne Tex. v. Cleburne

Living Ctr.*, 473 U.S. 432, 440 (1985). Class Representatives contend that "the only state

interest advanced by the termination of [class members'] Basic Health benefits is

reducing the state budget." (Inj. Mot. at 14.)  Defendant neither contests this assertion

nor articulates any additional state interests.  (*See generally* Resp. to Inj. Mot.)  Fiscal

considerations, however, are not a compelling state interest.  *Sudomir*, 767 F.2d at 1466,

n.14 ("[A] concern for fiscal integrity is not a compelling justification for an otherwise

invidious classification.").  Because Defendant does not assert a compelling interest, the

exclusion of Equal Protection class members from Basic Health does not withstand strict

scrutiny.  The court thus concludes that Class Representatives are likely to prevail on

their equal protection claim.

### 3.  Likelihood of Irreparable Harm

Class Representatives argue that they were irreparably harmed by the termination

of their Basic Health benefits because they cannot afford necessary medical care or

alternative health insurance.  (Inj. Mot. at 20-22.)  The Ninth Circuit has recognized that

the reduction or elimination of health benefits irreparably harms the participants in the

programs being cut.  *See, e.g.*, *Indep. Living Ctr. of S. Cali. v. Maxwell-Jolly*, 572 F.3d

644, 658-59 (9th Cir. 2009), *cert. granted*, 131 S. Ct. 992 (2011) (holding that state

Medicaid beneficiaries were likely to be irreparably harmed by a reduction in their

benefits); *Beltran v. Myers*, 677 F.2d 1317, 1322 (9th Cir. 1982) (holding that a denial of

needed medical care creates a risk of irreparable injury).  Defendant does not contest this

issue.  (*See generally* Resp. to Inj. Mot.)  The court, therefore, concludes that Class

Representatives have met their burden to demonstrate a likelihood of irreparable harm

absent preliminary injunctive relief.

### 4. Balance of Hardships and Public Interest

Class Representatives argue that the fiscal and administrative issues that would be caused by a preliminary injunction do not outweigh the preventable human suffering caused by the termination of Due Process and Equal Protection class members' Basic Health benefits. (Inj. Mot. at 22 (citing *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)).) Class Representatives also contend that the public interest favors an injunction that would safeguard access to public assistance and ensure that the government complies with the Fourteenth Amendment. (Inj. Mot. at 23.) Defendant responds that the balance of hardship tips in its favor and the public interest would not be served by a preliminary injunction because an injunction would cause Basic Health to overexpend its allotment, forcing the State to eliminate Basic Health altogether. (Resp. to Inj. Mot. at 25-26.) If the Basic Health program is eliminated, Defendant points out that approximately 42,500 Washington residents would lose their benefits. (*Id.* at 26.)

The elimination of the Basic Health program is a serious concern. If the State terminates the program, thousands of individuals will lose important benefits upon which they rely. However, although the record establishes that Basic Health was in significant danger before the Bridge Waiver (Cody Decl. ¶ 12), Defendant cites no evidence that the State will discontinue Basic Health rather than allocate funds that will bring the program into compliance with the Constitution. Accordingly, the court concludes that the balance of hardships and public interest weigh in favor of Class Representatives.

With respect to the balance of hardships, the Ninth Circuit has explained, "Faced with such a conflict between financial concerns and preventable human suffering, we

1  have little difficulty concluding that the balance of hardships tips decidedly in plaintiff's

2  favor." *Lopez*, 713 F.2d at 1437. The public interest also favors Class Representatives

3  because "[s]ociety's interest lies on the side of affording fair procedures to all persons,

4  even though the expenditure of governmental funds is required." *Id.* at 1438.

5  Furthermore, "it would not be equitable or in the public's interest to allow the state to

6  continue to violate the requirements of federal law, especially when there are no adequate

7  remedies available to compensate [plaintiffs] for the irreparable harm that would be

8  caused by the continuing violation." *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d

9  847 (9th Cir. 2009). In sum, the court concludes that Class Representatives have

10 established that they are entitled to a preliminary injunction.

11     **5. Bond**

12     Federal Rule of Civil Procedure 65 provides in relevant part: "No restraining or

13 preliminary injunction shall issue except upon giving of security by the applicant, in such

14 sum as the court deems proper, for the payment of such costs and damages as may have

15 been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). District courts have

16 discretion to determine the amount of security, if any. *Barahona-Gomez v. Reno*, 167

17 F.3d 1228, 1237 (9th Cir. 1999). Courts "may waive the bond requirement where the

18 plaintiffs are indigent." *V.L. v. Wagner*, 669 F. Supp. 2d 1106 (N.D. Cal. 2009).

19 Considering Class Representatives' and class members' limited financial resources, the

20 court waives the bond requirement.

21

22

### 6. Remedy

The court has concluded that Class Representatives have established a likelihood of success on the merits of their equal protection and due process claims, a risk of irreparable harm, and that the balance of hardships and public interest tip in their favor. The court, therefore, will enter a preliminary injunction ordering Defendant to reenroll members of the Equal Protection and Due Process classes in Basic Health effective the date of this order, provided that each member pays his or her premium. Defendant may not terminate any Due Process class member's benefits without providing constitutionally sufficient notice. The court directs the parties to meet and confer within seven days of this order regarding the language for the preliminary injunction and to submit proposed preliminary injunction orders within 14 days.

## III. CONCLUSION

For the reasons stated above, the court GRANTS IN PART and DENIES IN PART Plaintiffs' Second Amended Motion for Class Certification (Dkt. # 31). The Due Process and Equal Protection classes are defined as stated *supra*, section II(A)(4). The court appoints the Class Representatives as representatives for the Due Process and Equal Protection classes. The court appoints Blake Marks-Dias and Michael Pierson of Riddell Williams P.S. and Janet Varon and Daniel Gross of Northwest Health Law Advocates as class counsel.

The court GRANTS IN PART and DENIES IN PART Plaintiffs' Second Amended Motion for Preliminary Injunction (Dkt. # 32). The court waives the bond requirement and ORDERS preliminary injunctive relief as stated *supra*, section II(B)(6).

Dated this 28th day of September, 2011.

_____
JAMES L. ROBART
United States District Judge